UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO: 2:15-cr-156-FtM-29CM

SIMS JEROME COLLINS

---

## REPORT AND RECOMMENDATION[1]

Before the Court is Defendant's Motion for Suppression Hearing and Memorandum of Law ("Motion to Suppress") (Doc. 21), filed on March 3, 2016, which was referred to the undersigned by the Honorable John E. Steele for a Report and Recommendation.   The United States filed its response in opposition (Doc. 28) on March 22, 2016.   The undersigned held an evidentiary hearing on April 19, 2016. Docs. 22, 31.   Following the hearing, the Court afforded the parties until April 26, 2016 to file supplemental briefing if they wished.   Doc. 39.   On April 25, 2016, Defendant filed a Legal Memorandum in Support of Closing Argument.   Doc. 42. On April 26, 2016, the United States filed a Supplemental Brief on Motion to Suppress.   Doc. 43.   The motion is now ripe for review.

### I.    Background and Summary of Arguments

The indictment charges Defendant Sims Jerome Collins with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

---

[1] A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual findings or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

Doc. 1 at 1-2.   Defendant seeks to suppress physical evidence retrieved from the search of a vehicle he was operating on the date of his arrest and statements made by him subsequent to his arrest while in a holding cell at the Clewiston Police Department ("CPD").   Docs. 21, 42.

Defendant argues that the warrantless search of the vehicle after his arrest was in violation of the Fourth Amendment of the United States Constitution, and all evidence retrieved must be suppressed.   Docs. 21 at 1-6, 11-13; 42.   Defendant contends that there are no exceptions to the warrant requirement applicable in this case.   *See* Docs. 21 at 1-6, 11-13; 42.   Next, Defendant argues that any statements made by him must be suppressed due to the derivative violation of his Fourth Amendment right to remain free from unlawful seizure.[2]   *Id.* at 13.   Defendant further argues that deputies questioned him without the benefit of procedural safeguards mandated by *Miranda v. Arizona*, 384 U.S. 436 (1966), and any statements should be suppressed as direct violation of his Fifth Amendment rights to silence and to counsel.   *Id.* at 14.

The Government counters that the Court should not suppress the physical evidence because the automobile exception to the warrant requirement applies.   Doc. 28 at 4-6.   In the alternative, the Government contends that the inventory search exception applies.   Docs. 28 at 6 n.3; 43 at 3-5.   The Government further argues that

---

[2] In his Motion to Suppress, Defendant asserted two additional arguments, which he later abandoned.   *See* Docs. 21 at 6-15; 42 at 7.   Those arguments were: (1) that the K9 sniff was an unreasonable extension of a traffic stop (as the officers had no valid right to arrest Defendant upon the mere sighting of him); and (2) assuming a valid basis to arrest did exist, the warrantless search of the vehicle was unconstitutional and the search incident to arrest exception did not apply.   *See* Doc. 21 at 6-11.

Defendant's statements should not be suppressed as a derivative violation of his Fourth Amendment right to remain free from unlawful seizure because the Hendry County Sheriff's Office ("HCSO") deputies had three independent bases to arrest him: (1) an arrest warrant for violation of probation; (2) an open probable cause affidavit; and (3) the deputies personally witnessing Defendant, "a habitual traffic offender with a suspended license, commit a felony driving offense in their presence." *Id.* at 7. Moreover, the Government contends that Defendant's incriminating statements were spontaneously uttered in the absence of police questioning and, therefore, should not be suppressed. *Id.* at 7-9.

The undersigned concludes that the HCSO deputies had probable cause to search Defendant's vehicle[3] and that the vehicle was readily mobile; thus, the warrantless search is permissible under the automobile exception. The undersigned has analyzed the Government's alternative argument – that the inventory exception applies – and concludes that it does not apply. The Court also concludes that the HCSO deputies had probable cause to arrest Defendant; and, therefore, no derivative violation of his Fourth Amendment right to remain free from unlawful seizure occurred. Lastly, the Court concludes that Defendant's statements were not a result of custodial interrogation and therefore should not be suppressed. Accordingly, it is respectfully recommended that Defendant's Motion to Suppress be denied.

---

[3] For purposes of clarity, the testimony at the hearing was that the vehicle that Defendant was operating on the date of his arrest, a silver Infiniti, was owned by someone other than Defendant. Thus, "Defendant's vehicle" as used herein does not indicate that Defendant owned the vehicle, only that he operated the vehicle in question on the date of his arrest.

II.    **Summary of Evidence**

The Government called three law enforcement officers of the HCSO: Sergeant Nathan Kirk, Deputy Jackie Garrett, and Deputy Marty Bruce.   The Government also introduced seven exhibits, all of which were admitted into evidence: (1) arrest warrant for Defendant ("Gov. Ex. 1"); (2) CPD probable cause affidavit ("Gov. Ex. 2"); Google area map of 800 Maryland Ave., Clewiston, Florida ("Gov. Ex. 3"); HCSO Standard Operating Procedure for Impounded Property and Vehicles ("SOP") ("Gov. Ex. 4"); photograph of glove compartment with marijuana and a firearm ("Gov. Ex. 5"); photograph of an Apple brand baggie ("Gov. Ex. 6"); and photograph of a firearm and marijuana ("Gov. Ex. 7").   *See* Doc. 41.   Defendant did not call any witnesses, but introduced ten exhibits, eight of which were admitted into evidence: (1) Google road map of Harlem neighborhood, Clewiston, Florida ("Def. Ex. A"); (2) four photographs of 800 Maryland Ave., Clewiston, Florida ("Def. Exs. C, D, E, and F"); (4) HCSO property receipt listing item #7 ("Def. Ex. G"); (7) HCSO property receipt listing items ##1-6 ("Def. Ex. H"); and (8) photograph of 8th Ct. ("Def. Ex. J").   *See* Doc. 40.   The testimony is summarized below.

a) *Nathan Kirk*[4]

On September 1, 2015, Sergeant Kirk sought to arrest Defendant based on an active arrest warrant for violation of probation, issued in Hendry County, Florida and

---

[4] Sergeant Nathan Kirk is a K9 officer with the HCSO whose responsibilities include highway drug interdiction and executing arrest warrants.   He has twelve years of law enforcement experience.

a CPD open probable cause affidavit for forgery, fraud, larceny, and a third or subsequent offense of driving while license suspended.   Gov. Exs. 1, 2.[5]

Pursuant to the arrest warrant, Defendant was on probation for a term of twelve months for driving while license suspended and resisting without violence. Gov. Ex. 1.   According to the warrant, Defendant violated four conditions of his probation/community control.   *Id.*   Pursuant to the probable cause affidavit, on August 24, 2015, Defendant was driving a vehicle through the drive-through of First Bank of Clewiston and deposited a $4,000 check drawn from a closed account into his account.   Gov. Ex. 2.   Subsequently, on August 26, 2015, Defendant was a passenger in a vehicle driven by Breann Thompson through the drive-through of the same bank while Ms. Thompson attempted to deposit a suspicious $4,000 check from the same closed account into her account.   *Id.*

On September 1, 2015, Sergeant Kirk had information that Defendant was with Breann Thompson and was operating a silver Infiniti containing a Florida tag. Prior to setting out to arrest Defendant, Sergeant Kirk ran Defendant's driving history and discovered that his driver's license was revoked and Defendant was listed as a habitual traffic offender.   Sergeant Kirk decided to go to the Harlem community,[6] a neighborhood in Clewiston, Florida where he knew Defendant lived, to look for Defendant.   For approximately eight to nine years of his law enforcement

---

[5] The arrest report was written and signed by Officer B. McLeod; however, it was Sergeant Kirk who arrested Defendant.

[6] As of August 2015, the warrant states that Defendant's approved residence was 729 Mississippi Street, Clewiston, Florida, which Sergeant Kirk testified is in the Harlem community and within walking distance of 800 Maryland Ave - the location where Defendant ultimately was arrested.   *See* Gov. Ex. 1.

career, Sergeant Kirk used to patrol the Harlem community and was familiar with the area.   He described the neighborhood as very busy and one in which drug offenses, homicide, robberies, and grand theft frequently occurred.

That same day, Sergeant Kirk, Deputy Garrett, and Deputy Bruce,[7] each in individual marked vehicles, followed each other to the Harlem community to look for Defendant.   Sergeant Kirk described and demonstrated using a map of the neighborhood the route taken by the deputies and the location where they initially observed Defendant.   Gov. Ex. 3.   As the deputies were driving northbound on 8th Court and approaching the intersection of Maryland Avenue and 8th Court, Sergeant Kirk noticed a silver Infiniti traveling eastbound on Maryland Avenue slowly approach the house located at 800 Maryland Avenue and park on the edge of the driveway facing the house.[8]   Gov. Ex. 3.   He observed the driver, whom he immediately recognized to be Defendant, exit the vehicle.

Sergeant Kirk observed Defendant walk towards the front of the house, while at the same time preoccupied with a cell phone in his hand.   *See* Def. Ex. C. Sergeant Kirk slowly pulled in front of the driveway while simultaneously radioing the two deputies behind him to inform them that he located Defendant.   Once parked, Sergeant Kirk quickly advanced on Defendant, told Defendant that there was a warrant for his arrest, and commanded that Defendant put his hands behind his back and get on the ground.   Defendant looked around as if to flee, at which time

---

[7] All three were K9 officers.

[8] The vehicle was parked in a county-owned easement – a grassy area in front of the fence surrounding the house.   *See* Def. Ex. F.

Deputy Garrett and Deputy Bruce also quickly approached.   Defendant then complied, and he was placed in handcuffs.   Sergeant Kirk patted down Defendant to search for weapons, and seized from him a cellphone, a charger, and a wallet containing $1,100.00 in cash.   Defendant was escorted to Deputy Bruce's vehicle and, with his hands cuffed behind his back, was locked inside.   A short time after, Deputy Bruce escorted Defendant to the CPD.

Approximately fifteen minutes after Defendant was placed in custody, Sergeant Kirk deployed his K9 that was already on scene to sniff the vehicle.   The K9 sniff produced a positive alert on the passenger's side of the vehicle, and this also led Sergeant Kirk to believe that there was probable cause to search the vehicle. Sergeant Kirk testified that because of officer safety concerns, the vehicle was not searched on site.   Instead, Sergeant Kirk waited for an officer from the CPD to transport the vehicle back to the police station.   Officer B. McCloud with the CPD drove the vehicle to the CPD.

Sergeant Kirk then was questioned about the HCSO vehicle impounding and seizing policy.   Gov. Ex. 4.   The policy states, in pertinent part,

> [v]ehicles which are towed . . . incident to an arrest . . . become the responsibility of the impounding Deputy. . . . To insure that liability does not attach for property located within any package or container, the contents of said package or container, whether it is opened or closed, is to be ascertained and inventoried.

Gov. Ex. 4 at 1, § III.   The SOP outlines several circumstances in which deputies are vested with authority to remove property or vehicles from public property.   Sergeant Kirk identified four such circumstances that he believed were applicable in this case,

1. To ensure the safety and security of the property.

2. The driver/owner of the property is unavailable (arrested, out of town, injured, etc.) and alternatives in lieu of impound have been examined.

3. The property is being seized in accordance with the Florida Contraband Forfeiture Act.

4. The property (including vehicles) is evidence.

Gov. Ex. 4 at 1, §§ IV.A. vi, vii, ix and x, respectively.

Here, Sergeant Kirk testified the Infiniti needed to be removed for several reasons, among them officer safety concerns and because it might be stolen if left in the location where it was parked.[9]   The car's owner was not present.[10]   If it were released to anyone designated by Defendant, Sergeant Kirk testified there also would be a preservation of evidence concern.   Moreover, the vehicle itself was considered evidence with respect to the CPD case, as alleged in the probable cause affidavit, and for the driving offense that Sergeant Kirk had personally witnessed.   *See* Gov. Ex. 2. Specifically, Sergeant Kirk testified that the CPD wished to have the vehicle for processing since it was involved in the crime of forgery and fraud.   The deputies also intended to seize the vehicle under the Florida Contraband Forfeiture Act.

With respect to the procedure for effecting removal, the SOP states that "the vehicle may be towed to an impound lot by the 'on call' wrecker of which is contacted by the Communications Section."   Gov. Ex. 4 at 2, § V.D.ii.   The SOP mandates that

---

[9] Sergeant Kirk testified that he is aware arrestees have sued HCSO over missing property.   Moreover, the occupants of the house on 800 Maryland Ave. came out and expressed that they did not want the Infiniti on their property.
[10] As noted, Defendant was not the owner of the vehicle.   Sergeant Kirk testified that he ran the tag on the Infiniti and was advised as to the owner of the vehicle.

a tow sheet be completed that includes, among other things: the location to which the vehicle is being towed, reason for removal or tow, and an inventory of its contents. *Id.* at 6, § V.I.ii.   A tow sheet is described as "a report that shall be utilized to document the towing, seizure, recovery or storage of all vehicles by the [HCSO]."   *Id.* at 6, § V.I.i.

Sergeant Kirk's understanding of the policy is that it permits, but does not compel, a tow.   When afforded time by defense counsel to review the SOP, however, and identify the explicit authority in the SOP that permits a law enforcement officer to drive an impounded vehicle as opposed to summoning a towing service, Sergeant Kirk could not do so.   Nonetheless, he testified that while "it's not defined in our policy, it is standard practice that we have practiced and still perform to this day."

Once the vehicle was driven to the CPD, Sergeant Kirk searched the vehicle. He found and seized approximately 50 grams of marijuana and a loaded firearm from the glove compartment box.   Gov. Ex. 5.   From the center console, he found and seized approximately three or four prepackaged bags of marijuana, each weighing approximately one gram.   Gov. Ex. 6.   After the search, the vehicle was turned over to the HCSO.   Sergeant Kirk did not conduct a complete inventory of the vehicle. Instead, Sergeant Kirk completed property receipts, which only listed evidence he believed to be fruits of the crime.   Def. Exs. G, H.

Upon arrival at the CPD, Defendant was placed in a temporary holding cell.[11] Sergeant Kirk informed Defendant of the charges for which he was arrested, and

---

[11] Defendant was not booked at the CPD but ultimately was transported to the Hendry County Jail.

explained to him that the car and money were going to be seized.   In response, Defendant told him that they could not seize his money or the car, but that the gun and the marijuana were his.   During his encounter with Defendant, Sergeant Kirk never read Defendant his *Miranda* rights.   Sergeant Kirk testified he did not do so because he did not intend to interrogate Defendant, he did not ask him any questions, and he did not inform Defendant of the charges with an intent to get him to confess.

Sergeant Kirk could not recall what time Defendant arrived at the CPD, what time he informed Defendant of the charges for which he was arrested, and what time Defendant was transported from the CPD to the Hendry County Jail.   Sergeant Kirk did not know whether anyone read Defendant his *Miranda* rights or whether Defendant invoked his right to silence or his right to counsel while at the CPD. Sergeant Kirk could not recall whether Defendant ever inquired of the charges against him, but testified that he informs every arrestee of the reason for his or her arrest.

### b) Jackie Garrett[12]

Consistent with Sergeant Kirk's testimony, on September 1, 2015 at approximately 1:30 p.m., Deputy Garrett sought to arrest Defendant based on a violation of probation warrant and a CPD probable cause affidavit.   Gov. Exs. 1, 2. Before he set out to arrest Defendant, Deputy Garrett verified that the warrant was

---

[12] Jackie Garrett is a K9 deputy with the HCSO who has eleven years of law enforcement experience.   His responsibilities include drug interdiction and executing arrest warrants.

active.   He also was made aware that Defendant's driving history listed him as "suspended habitual."[13]

Deputy Garrett was with Deputy Bruce and Sergeant Kirk.   Each were traveling to the Harlem community in individual marked vehicles.   Deputy Garrett knew that Defendant had previously fled from police and knew that Defendant was a fast runner.[14]   Prior to locating Defendant, the three officers went to the home of Breann Thompson, which was within walking distance to 800 Maryland Ave., in an attempt to locate Defendant.[15]   As they were traveling north on 8th Court, they observed a vehicle pulling off the roadway on Maryland Ave.   They observed Defendant exit the vehicle.   Sergeant Kirk made contact with Defendant and gave him verbal orders.   Initially, Defendant was looking around so as to give Deputy Garrett the impression that he was about to flee, but ultimately obliged with the commands to lay on the ground.   Defendant was placed into custody and secured in Deputy Bruce's vehicle.

Deputy Garrett also is familiar with the Harlem neighborhood and also testified that it is a busy neighborhood and one in which burglaries, shootings, and grand theft occur with frequency.   While Deputy Garrett did not deploy his K9 to sniff the vehicle, he was present for the K9 sniff and observed that the dog gave a

---

[13] He knew that Defendant was driving a silver Infiniti because it was the vehicle used in the forgery incident alleged in the CPD open probable cause affidavit.

[14] Deputy Garrett testified that he coached a football team that played against a team of which Defendant was a member.   He was aware that Defendant had a reputation for being a fast runner.

[15] This home was the most southwestern point on 8th Court as portrayed in Gov. Ex. 3.

positive alert and changed his behavior on the passenger's side of the vehicle.

The officer testified that they did not search the vehicle on site because they did not feel that it was a safe area to do so.   Deputy Garrett further testified that he was familiar with the SOP, and identified safety and security of the property as reasons to remove the vehicle from the neighborhood.   Moreover, CPD told them that the vehicle was used in the commission of a felony and it needed the vehicle to further investigate the case.   Specifically, it had a bank surveillance video of the vehicle being used in "committing forgery."   The officers also were concerned that the evidence in the vehicle would have been disposed of if the vehicle were released to someone who Defendant designated.

When Deputy Garrett arrived at the CPD, Defendant was already in a holding cell.   Officer McCloud, Deputy Bruce, and Sergeant Kirk also were present.   Deputy Garrett testified that he did not interrogate Defendant, he did not ask him any questions, he did not provide Defendant his *Miranda* rights, he did not inform Defendant of his charges, and he took no part in processing Defendant.   With respect to any exchanges with Defendant, Deputy Garrett testified that while he, Deputy Bruce, and Sergeant Kirk were counting the money seized from Defendant's wallet, they advised Defendant that they "should seize the money based on the case the [CPD] had where the $4,000 was taken out of the accounts of other people."   This exchange occurred in close proximity, about two feet away from Defendant, so he could hear what they were saying.   Deputy Garrett testified that Defendant responded, "[m]y gun, my weed. You can't take my effing money."

c) *Marty Bruce*[16]

Consistent with the other officers' testimony, on September 1, 2015, Deputy Bruce sought to arrest Defendant due to a warrant for violation of probation and an open probable cause affidavit from the CPD.   Gov. Exs. 1, 2.   Prior to setting out to arrest Defendant, Sergeant Kirk ran Defendant's driver's license and discovered that it was suspended.

Deputy Bruce is familiar with the neighborhood in which the arrest occurred and described it as a "high crime area, drug infested area" in which more crimes occur "than anywhere else in the entire county."   The types of crimes that occur involve firearm offenses, grand theft, and robberies.   Before going to 800 Maryland Ave., Sergeant Kirk, Deputy Garrett and Deputy Bruce went to the home of Breann Thompson, which was within walking distance to 800 Maryland Ave.   They did not locate Defendant or Ms. Thompson there.   As the officers drove North on 8th Court, they noticed Defendant pull into 800 Maryland Avenue and exit the vehicle.[17] Deputy Bruce testified that once Defendant exited the vehicle, the officers gave him verbal commands to get down on the ground, and he complied.   Defendant was then placed in Deputy Bruce's patrol car.   Deputy Bruce patted down Defendant and did not recall recovering anything.   He transported Defendant to the CPD and placed him in a holding cell.

---

[16] Deputy Bruce is employed as a K9 handler with the HCSO.   His job responsibilities also include highway drug interdiction and executing arrest warrants.

[17] With respect to the vehicle that Defendant might be driving, Deputy Bruce recalled looking for a vehicle that was described in the CPD probable cause affidavit that was used in the drive-through of Clewiston Bank.

Deputy Bruce testified he did not intend to interrogate Defendant and never asked him any questions.   The officer did not provide Defendant his *Miranda* rights nor could he recall anyone else doing so.   Deputy Bruce did not inform Defendant of his charges.   He did not tell Defendant anything about forfeiting the cash and the vehicle, but was present when Defendant was made aware of this.   In response, Deputy Bruce heard Defendant admit that the gun was his and state that just because they found the gun and the drugs, they could not take his money.[18]   *Id.* Deputy Bruce was not on the scene during the K9 sniff of the silver Infiniti and had nothing to do with the decision to impound the vehicle.   Back at the police station, Sergeant Kirk conducted most of the search of the silver Infiniti and Deputy Bruce partially assisted.

## III.   Analysis

### a.   *Whether the warrantless search was permissible under the automobile exception*

Defendant argues that the warrantless search of the Infiniti was in violation of the Fourth Amendment, and no exception to the warrant requirement applies. The Government counters, *inter alia*, that the automobile exception applies.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   The Supreme Court has held that warrantless searches "are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically

---

[18] Deputy Bruce could not recall what Defendant said verbatim but knew the basic content of his response.

established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).   One such exception is the "automobile exception," as first set forth in *Carroll v. United States*, 267 U.S. 132 (1925).   The exception permits law enforcement to conduct a warrantless search of a readily mobile vehicle, provided there is probable cause to believe that that the vehicle contains contraband. *Pennsylvania v. Labron*, 518 U.S. 938 (1996); *see also United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007) ("The automobile exception allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search.").   Moreover, the exception extends to the entire vehicle and the containers within it.   *California v. Acevedo*, 500 U.S. 565, 580 (1991).

In delineating this exception, the Supreme Court recognized the inherent mobility of vehicles, noting

> a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Carroll,* 267 U.S. at 153.   Later Supreme Court precedent provided further justification for the automobile exception; namely, the reduced expectation of privacy in vehicles.   *See California v. Carney*, 471 U.S. 386, 391 (1985) ("Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.").   This reduced expectation of privacy stems from a pervasive governmental regulation of vehicles.   *Id.* at 392.

Probable cause to search a vehicle "exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Lindsey*, 482 at 1293.   The Eleventh Circuit has recognized that "probable cause arises when a drug-trained canine alerts to drugs." *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993); *see also United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006) (holding that a positive alert from a narcotics detection dog was itself sufficient to give agents probable cause to search the vehicle). In the case at bar, Defendant does not challenge that Sergeant Kirk had probable cause to search the Infiniti.   Indeed, because the K9 sniff gave a positive alert on the passenger side of the Infiniti, Sergeant Kirk had probable cause to search the vehicle. *See e.g., Banks*, 3 F.3d at 402.

Defendant argues, however, that the automobile exception does not apply here because the Infiniti was incapable of mobility since Defendant had been subdued and handcuffed by the deputies before the search occurred.   Docs. 21 at 11-13; 42 at 4-7. This argument is without merit.   The automobile exception is premised on the *inherent* mobility "in all automobiles that reasonably appear to be capable of functioning." *United States v. Nixon*, 918 F. 2d 895, 903 (1990).   In other words, "[a]ll that is necessary to satisfy this element is that the automobile is operational." *United States v. Watts*, 329 F. 3d 1282, 1286 (11th Cir. 2003).   The Eleventh Circuit rejected a similar argument that the automobile exception does not apply, for example, "because [the defendant] was already in custody and police officers had possession of his car keys at the time of the search." *States v. Birdsong*, 982 F.2d

481, 483 (11th Cir. 1993).   Thus, whether Defendant was under arrest and incapable of driving the vehicle away is inconsequential.

Defendant cites *United States v. Navas*, 597 F.3d 492 (2d Cir. 2010), in support of his argument that the ready and inherent mobility of an automobile is a precondition.   Doc. 21 at 12.   While the general proposition is true, the *Navas* court rejected the precise argument that Defendant raises here, that the vehicle was incapable of mobility because Defendant already was detained.   In *Navas*, the Second Circuit decided whether a warrantless search of a trailer that was unhitched from its cab was permissible under the automobile exception.   597 F.3d at 497.   In holding that it was, the court held that the inherent mobility of the vehicle, "not the probability that it might actually be set in motion" or "the potential for the vehicle to be moved from the jurisdiction" is the foundation of the mobility rationale.   *Id.* at 498.   Thus, the fact that the defendants were under arrest and incapable of driving the vehicle away was insignificant, for "[a]lthough the arrestees were detained and the warehouse was secured by the agents, these facts had no bearing on the inherent mobility of the trailer itself."   *Id.* at 500.   Although not controlling on this Court, the *Navas* decision and its rationale are consistent with Eleventh Circuit precedent that "[a]ll that is necessary . . . is that the automobile is operational."   *Watts*, 329 F.3d at 1286.   Its decision, therefore, is persuasive authority and provides further support for the Court's conclusion.

Defendant next argues that "assuming arguendo there was a reasonable basis to immediately search the Infiniti at 800 Maryland Avenue because of the exigency

of its ready mobility, the decisions and the actions of Sergeant Kirk [to summon a police officer to drive the car to the police station] completely neutralized that exigency."[19]   Doc. 42 at 6.   The Supreme Court, however, has noted that none of its cases suggest such a limitation.   *Johns*, 469 U.S. at 485.   *Johns* involved a warrantless search of vehicles after they were removed from the scene of the arrest to the Drug Enforcement Administration (DEA) headquarters.   *Id.* at 481. Although the vehicle was searched at DEA headquarters and certain packages were seized, the packages were not opened until three days after they were seized from the vehicles.   *Id.*   The Court held,

> our previous decisions indicate that the officers acted permissibly by waiting until they returned to DEA headquarters before they searched the vehicles and removed their contents. There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure. The justification to conduct such a warrantless search does not vanish once the car has been immobilized. A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search.

*Id.* at 484 (internal citations omitted).   This case alone forecloses Defendant's argument; however, the Eleventh Circuit also has rejected a contention under similar circumstances.   *See United Birdsong*, 982 F.2d at 483 ("[O]nce law enforcement officers have probable cause to conduct a warrantless search of a vehicle, the officers

---

[19] The Government responds that there is no additional exigency requirement under the automobile exception.   Docs. 28 at 5-6; 43 at 2 n.1.   The Court believes Defendant to mean the exigency that is itself satisfied by the ready mobility inherent in automobiles, and not an additional exigency requirement.   *See Nixon*, 918 F. 2d at 903.   In any event, the law is abundantly clear, there is no requirement of exigent circumstances to justify a warrantless search pursuant to the automobile exception *beyond* the exigency inherent in the ready mobility of the vehicle. *See e.g., id.*; *United States v. Johns*, 469 U.S. 478, 484 (1985).

may conduct the warrantless search even after the vehicle is impounded and in police custody.") (citing *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990)); *see also Lindsey*, 482 F.3d at 1293. ("[T]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure") (quoting *Johns*, 469 U.S. 478).

Here, the officers observed Defendant drive the vehicle moments before his arrest. There is nothing to suggest that the vehicle suddenly lost its capability of functioning or that it no longer was operational. Because Defendant's location is irrelevant, the vehicle was readily mobile. Defendant has not cited any authority that holds the removal of a vehicle otherwise subject to a warrantless search in its initial location renders the vehicle immobile simply because it was transported to a police department. Moreover, there is nothing to suggest that the method of transport of the vehicle renders the vehicle immobile. Accordingly, because the vehicle was readily mobile, the warrantless search that was supported by probable cause is permissible under the automobile exception.[20]

   b.   *Whether the warrantless search was permissible under the inventory search exception*

In the alternative, the Government argues, and Defendant vehemently

---

[20] Notably, because the vehicle was witnessed being driven on public roads and used for transportation, Defendant had a lesser expectation of privacy, and the second justification for the warrantless search also is met. The reduced expectation of privacy in vehicles justifies the use of the automobile exception "[e]ven in cases where an automobile was not immediately mobile." *Carney*, 471 U.S. at 391 (citing *e.g., Cady v. Dombrowski*, 413 U.S. 433 (1973), in which the warrantless search of a disabled vehicle stored at the direction of police because the driver was drunk and later became comatose was not unreasonable when the search occurred for safety reasons and pursuant to "standard procedure").

opposes, that the HCSO SOP authorized Deputies to impound the silver Infiniti, and therefore, the inventory search exception applies.

The Supreme Court has held that inventories pursuant to standard police procedures are reasonable. *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976). "If a search is to be upheld under the inventory search doctrine, . . . the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the policy." *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991). Inventories involve searches conducted not for purposes of criminal investigation but rather to protect the owner's property from loss or theft and the police from unjustified lawsuits arising from such loss and theft while the property is in police custody. *See e.g., id.* ("Inventory searches are not meant as investigatory technique but as a means for safeguarding individuals' possessions and protecting the police from false claims.") (citing *Colorado v. Bertine* 479 U.S. 367, 372 (1987)).

In *Opperman*, the Court stated that it "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." 428 U.S. at 373. The Court concluded that a warrantless search pursuant to standard police procedures was not unreasonable where there was "no suggestion whatever that [the] standard procedure . . . was a pretext concealing an investigatory police motive." *Id.* at 376. Similarly, in *Bertine,* the Court upheld a warrantless search where there was no evidence that "the police, who were following procedure, acted in bad faith or for the sole purpose of investigation." 479 U.S. 367, 372. Three justices, out of a

seven-justice majority, wrote a separate concurrence to highlight the importance of conducting inventories only pursuant to standardized police procedures:

> The underlying rationale for allowing an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of the inventory search. This absence of discretion ensures that inventory searches will not be used as a purposeful and general means of discovering evidence of crime.

*Bertine*, 479 U.S. at 372 (Blackmun, J. concurring).   The Court later reiterated that "[t]he policy or practice governing inventory searches should be designed to produce an inventory." *Florida v. Wells*, 495 U.S. 1 (1990).   The Eleventh Circuit also has held, "[a]n inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory."   *United States v. Khoury*, 901 F.2d 948, 958 (11th Cir.), opinion modified on denial of reh'g, 910 F.2d 713 (11th Cir. 1990).

While Defendant does not dispute that the purpose of the SOP is to safeguard the HCSO from claims arising from impounding vehicles, Defendant argues that Sergeant Kirk failed to abide by the SOP in several respects.   Doc. 42 at 1-4.   First, he argues, Sergeant Kirk acted in contravention of the SOP when he failed to summon a tow truck but instead waited for Officer McCloud to drive the vehicle.   *Id.* at 3.   Next, Sergeant Kirk failed to complete a tow sheet indicating an inventory of the Infiniti but only completed property receipts containing an itemization of items he believed to be incriminating.   *Id.*   Third, Defendant points out the Infiniti was transported to the CPD rather than the Hendry County Sheriff's storage facility or impound lot.   *Id.*   Consequently, Defendant argues that these actions make it clear

that the searching officers were not concerned with civil liability, but rather "this was a warrantless search for incriminating evidence."   *Id.* at 3.

With the facts before the Court, the inventory exception does not apply. Although there exists a HCSO standard policy for impounding and inventorying vehicles, Sergeant Kirk failed to follow the policy.   As the cases above suggest, Sergeant Kirk's conduct (and testimony) demonstrates that he was primarily driven by an investigatory motive, rather than concerned with protection of civil liability for the HCSO.   Although the SOP authorized the initial removal of the Infiniti, Sergeant Kirk failed to conduct the subsequent search in compliance with the policy.

The SOP authorizes removal of the vehicle under certain delineated exceptions, which apply here.   Gov. Ex. 4, §IV.A.vi, vii, ix, x.   Each officer testified that they were concerned about the safety of the Infiniti, that the driver and owner of the Infiniti were unavailable, that the Infiniti itself was considered evidence in the CPD case, and that they intended to seize the vehicle in accordance with the Florida Contraband Forefeiture Act.   Each of these reasons standing alone would authorize them to remove the Infiniti from the Harlem community. *See id.*   According to Sergeant Kirk's testimony and the SOP, removal of the vehicle by a towing service was permitted but not required.   *Id.* at 2, § V.D.ii. ("[T]he vehicle *may* be towed to an impound lot by the on call' wrecker of which is contacted by the Communications Section.") (emphasis added).   Sergeant Kirk's compliance with the SOP, however, stops here.

SOP contemplates storage of the items at the HCSO or an approved location.

*See* Gov. Ex. 4 at 1, § 1 ("The purpose of this [SOP] is to establish guidelines for impound, storage and release of vehicles and other property stored *at the [HCSO] or an approved facility."*) (emphasis added). If a vehicle is seized as a result of the Florida Forfeiture Act, it requires the vehicle to "be driven to the HCSO, if at all possible to avoid additional towing charges." Gov. Ex. 4 at 6, § V.H.ii.b. These guidelines further mandate in every case that a tow sheet be completed with an inventory of contents. *Id.* at 6, § V.I.ii. Here, neither occurred. There was no testimony that driving a vehicle to a police station other than the HCSO or to an impound lot was standard procedure. Instead, the Infiniti was taken to the CPD and each officer testified that he knew the CPD wanted the vehicle for processing in the fraud case. Sergeant Kirk testified that he did not complete a tow sheet because he only gathered evidence he believed to be fruits of crime. Thus, the search was not precipitated by a need to inventory the items for safekeeping but was guided by an investigatory pretext for the CPD case. Accordingly, because the search was conducted for purposes of criminal investigation and not to protect Defendant's property from loss or theft, the inventory search exception does not apply.

      c.     *Whether there was a derivative violation of Defendant's Fourth Amendment right to remain free from unlawful seizure*

Defendant argues that "if the police had no valid right to arrest Mr. Collins upon the mere sighting of Mr. Collins, the statements were elicited subsequent to an illegal detention or illegal search. The statements are constitutionally inadmissible as an unattenuated, derivative violation of Mr. Collins's Fourth Amendment rights."

Doc. 21 at 13.   This argument also is without merit because Defendant was lawfully arrested.

"Probable cause to arrest exists where the totality of the facts and circumstances support a reasonable belief that the suspect had committed or was committing a crime." *Lindsey*, 482 F. 3d at 1291.   Here, each witness testified that he had probable cause to arrest Defendant based on the active arrest warrant and the CPD probable cause affidavit.   The officers also witnessed Defendant driving while his license was verified to be suspended or revoked.   Pursuant to the probable cause affidavit, this would be Defendant's third or subsequent offense, a felony in violation of Section 322.32(2)(c), Florida Statues.   Defendant does not challenge the validity of the arrest warrant, the probable cause affidavit, or whether Defendant was driving while his license was suspended or revoked.   Thus, Defendant's arrest was not absent probable cause, and his post arrest statements were not made subsequent to an unlawful seizure.   His statements, therefore, should not be suppressed based on an unattenuated, derivative violation of his Fourth Amendment rights.

         d.    *Whether Defendant was subject to custodial interrogation without first being advised of his* Miranda *rights*

Defendant contends that he was questioned without the benefit of the procedural safeguards mandated by *Miranda*, 384 U.S. 436.   Doc. 21 at 14. *Miranda* established certain procedural safeguards intended to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. 384 U.S. 436.   These safeguards include warnings that the accused has a right to

remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Id.* at 444.   The prosecution may not use any exculpatory or inculpatory statements stemming from custodial interrogation of a defendant unless it demonstrates the use of these procedural safeguards.   *Id.* at 444.   Thus, before the warnings need be given, it must be established that a defendant was both "in custody" and under "interrogation" by law enforcement.   *Id.*

Defendant was arrested and was placed in a holding cell at the CPD.   There is no dispute that he was in custody.   The question is whether he was subject to interrogation.   The Government contends that nothing the officers said or did amounted to an interrogation, and Defendant's statements were voluntary.   Doc. 28 at 7-9.   The Supreme Court in *Miranda* held that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."   *Miranda*, 384 U.S. at 478.   Later, in addressing the meaning of interrogation for the first time since *Miranda*, the Court held

> [t]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).   Here, the testimony of each of the officers reflects that the only conversations that the officers had with Defendant

were to inform him of the charges against him and advise that his money and vehicle were going to be seized.   Sergeant Kirk testified that informing defendants of the charges against them is normally attendant to every arrest he makes.   Thus, this itself, does not amount to interrogation.   *Id.*; *Alvarez v. McNeil*, 346 F. App'x 562, 564 (11th Cir. 2009) ("Informing a person in custody of the charges that he faces is normally attendant to arrest and custody and does not constitute interrogation."). Moreover, "*Miranda* does not erect an absolute *per se* bar on any conversation with the accused by the investigating officer."   *United States v. Castro*, 723 F.2d 1527, 1532 (11th Cir. 1984).   Even though the officers advised Defendant that his money was likely to get seized, there was nothing in the testimony to suggest that they knew that it would elicit a response from Defendant concerning the ownership of the gun. The Court found each the testimony of each witness to be credible and not inconsistent.   Accordingly, Defendant was not under interrogation when he made the statements concerning his gun.

## IV.   Conclusion

For the foregoing reasons, the Court concludes that Sergeant Kirk, Deputy Garrett and Deputy Bruce had probable cause to arrest Defendant and to search the silver Infiniti.   The probable cause to search the Infiniti did not vanish once the Infiniti was removed to the CPD.   As Defendant was lawfully arrested, there was no derivative violation of his Fourth Amendment right to remain free from unlawful seizure.   Once at the CPD, Defendant was not under interrogation.   As Defendant

was not subject to interrogation, any statements he made were voluntary and should not be suppressed.

Accordingly, it is hereby **RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress (Doc. 21) be denied.

**DONE** and **ENTERED** in Fort Myers, Florida on this 31st day of May, 2016.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Honorable John E. Steele
Counsel of Record